**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **PAULA F.,** )<br>)<br>    **Plaintiff,** )<br>)<br>    v. )<br>)<br>**ANDREW M. SAUL,** )<br>**Commissioner of Social Security,** )<br>)<br>    **Defendant.** ) | **No. 19 C 261**<br><br>**Magistrate Judge Finnegan** |

**ORDER**

Plaintiff Paula F. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the Commissioner's decision should be reversed or the case remanded. The Commissioner responded with a competing motion for summary judgment in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court agrees with Plaintiff that the case must be remanded for further proceedings.

**BACKGROUND**

Plaintiff applied for DIB on December 8, 2014, alleging disability since May 31, 2014 due to arthritis in the left leg, bipolar disorder, major depressive disorder with suicidal ideation, and rods and screws in the left leg. (R. 226, 231, 274). Born in April 1973, Plaintiff was 41 years old as of the alleged disability onset date and 44 years old as of the administrative hearing, making her at all relevant times a younger individual. (R. 226,

275); 20 C.F.R. § 404.1563(c). She finished one year of college, completed a phlebotomy internship, and obtained a commercial driver's license. (R. 41-42, 275). Plaintiff's past jobs include baker and dispatch operator, but most recently she spent approximately 3 years working as a truck driver from January 2011 to May 2014. (R. 42-49, 263, 275-76). She stopped driving a truck on May 31, 2014 because she could no longer handle the job requirements, including climbing in and out of the trailer, and she has not worked since that date. (R. 50).

The Social Security Administration denied Plaintiff's application initially on April 14, 2015, and again upon reconsideration on August 14, 2015. (R. 83-119). Plaintiff filed a timely request for a hearing and appeared before administrative law judge Matthew Johnson (the "ALJ") on April 4, 2017. (R. 36). The ALJ heard testimony from Plaintiff, who was represented by counsel, from Plaintiff's fiancé Mark A. Sosa, and from vocational expert Lee Knutson (the "VE"). (R. 38-82). On October 4, 2017, the ALJ found that Plaintiff's dysfunction of major joints of the left knee status post knee replacement; obesity; depression; bipolar disorder; anxiety disorder; post-traumatic stress disorder ("PTSD"); alcohol abuse; and substance abuse are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 13-16). After reviewing the medical and testimonial evidence, the ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform sedentary work with: frequent operation of foot controls with the left foot at the light weight level; frequent pushing and pulling with the left leg at the light weight level; occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling. (R. 17). Plaintiff can frequently work in environments

2

involving unprotected heights, moving mechanical parts, operation of a commercial moving motor vehicle, humidity and wetness, and extreme cold. (*Id.*). With respect to Plaintiff's mental functioning, the ALJ found her capable of understanding, carrying out, remembering, and performing simple, routine and repetitive tasks involving only simple, work-related decisions with the ability to adapt only to routine workplace changes. Plaintiff can also occasionally interact with supervisors and coworkers but can have only superficial, non-transactional contact with the general public. (*Id.*).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and RFC cannot perform any past work but can handle other jobs available in significant numbers in the national economy, including Final Assembler Optical Goods, Weight Tester, and Stuffer. (R. 27-28). As a result, the ALJ found that Plaintiff was not disabled at any time from the May 31, 2014 alleged disability onset date through the date of the decision. (R. 28-29). The Appeals Council denied Plaintiff's request for review (R. 1-6), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) erred in weighing the opinions of her treating psychiatrist, Mary E. Belford, M.D.; (2) failed to properly evaluate her mental RFC; (3) did not fairly assess her physical impairments; and (4) erred in discounting her statements regarding the limiting effects of her symptoms. For reasons discussed in this opinion, the Court agrees with Plaintiff that the case must be remanded for further consideration of Dr. Belford's opinions.

3

**DISCUSSION**

**A.     Standard of Review**

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g) of the Social Security Act (the "SSA"). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

**B.     Five-Step Inquiry**

To recover disability benefits under the SSA, a claimant must establish that she is disabled within the meaning of the SSA. *Snedden v. Colvin*, No. 14 C 9038, 2016 WL 792301, at *6 (N.D. Ill. Feb. 29, 2016). A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to law for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [s]he can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520). If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five. *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

**C.     Analysis**

    **1.     Dr. Belford's Opinions**

Plaintiff argues that the case must be reversed or remanded because the ALJ erred in affording only little weight to the opinions from her treating psychiatrist Dr. Mary Belford. (Doc. 22, at 5). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and

5

is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as he provides an adequate explanation for doing so. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). That is to say, the ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(6); 20 C.F.R. § 416.927(c)(2)-(6); see *Simila*, 573 F.3d at 515.

     Dr. Belford completed an assessment of Plaintiff's mental functioning on June 1, 2015. She noted that she had been treating Plaintiff monthly to every three months since June 10, 2007 due to major depression, recurrent; generalized anxiety disorder; and PTSD. (R. 815). Plaintiff's symptoms include sleep disturbance, psychomotor agitation, decreased energy, and feelings of guilt/worthlessness. (*Id.*). Dr. Belford opined that Plaintiff suffers from moderate restriction of activities of daily living, and moderate difficulties maintaining social functioning. Plaintiff also demonstrates marked deficiencies of concentration, persistence, or pace, and has experienced one or two episodes of decompensation. (R. 816). With respect to specific work-related activities, Dr. Belford

6

found Plaintiff to have marked limitation in 5 areas, including: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; working within a schedule and maintaining regular attendance; and completing a normal workday/workweek without undue interruptions from psychologically based symptoms. (R. 817).

In 15 other areas, Dr. Belford reported moderate limitation in Plaintiff's ability to: understand, remember, and carry out simple instructions; sustain an ordinary routine without special supervision; work with or near others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions and request assistance; interact appropriately with supervisors and co-workers; maintain socially appropriate behavior; respond appropriately to changes in the work setting; be aware of normal workplace hazards; use public transportation; and set realistic goals. (*Id.*). Dr. Belford further indicated that Plaintiff would miss 3 or more days of work per month due to her symptoms. (*Id.*).

A year later, on May 20, 2016, Dr. Belford completed a Mental Impairment Questionnaire regarding Plaintiff's functioning. Plaintiff's diagnoses at that time included bipolar disorder, depression, PTSD, and generalized anxiety disorder. Dr. Belford opined that Plaintiff has frequent episodes of decompensation due to stressors with her family, as well as the following additional symptoms: sleep disturbance; emotional lability; manic syndrome; mood disturbance; hostility and irritability; difficulty thinking or concentrating; feelings of guilt/worthlessness; generalized persistent anxiety; suicidal ideation or attempts; psychomotor agitation or retardation; and impulsivity. (R. 845). Plaintiff

7

experiences mood swings that prompt self harm and aggressive thoughts, and there is "some inconsistency" in her medication compliance, giving her a guarded prognosis. (*Id.*).

Dr. Belford stated that as a result of Plaintiff's impairments, she would be absent from work more than 3 times per month, and her symptoms would interfere with the attention and concentration needed to perform even simple work tasks for 21% or more of the day. (R. 846, 847). Plaintiff also has moderate limitations in 13 areas relating to mental abilities and aptitude to do unskilled work. These include: remembering locations and work-like procedures; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being unduly distracted by them; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; responding appropriately to changes in a routine work setting; being aware of normal hazards and taking appropriate precautions; and setting realistic goals or making plans independently of others. (R. 846). Finally, Plaintiff has moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; marked deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and repeated (3 or more) episodes of decompensation. (R. 847).

8

On January 13, 2017, Dr. Belford submitted a third assessment of Plaintiff's functioning. She opined that Plaintiff would be unable to maintain focus for at least 50% of the workday due to uncontrollable mood swings and anxiety. (R. 375). Plaintiff would also miss work each week as a result of her "mood and anxiety fluctuations." (R. 376). Dr. Belford further confirmed that Plaintiff's mood swings, poor concentration, and poor impulse control would interfere with her performance in the workplace. (*Id.*).

In assigning Dr. Belford's opinions little weight, the ALJ first indicated that the treatment notes do not support the stated functional restrictions. (R. 25). By way of example, the ALJ noted frequent mentions of Plaintiff being "alert and oriented to time, person, and place, with no homicidal or suicidal ideations." (*Id.*). Those same notes, however, also detailed significant abnormalities and fluctuations in Plaintiff's mood and behavior that support Dr. Belford's opinions.

On October 11, 2013, shortly before the May 31, 2014 alleged disability onset date, Dr. Belford noted that Plaintiff was "a mess" and really struggling. (R. 760). Though Plaintiff did not report any suicidal or homicidal ideations, her depression and anhedonia symptoms were worse, as were her frustration tolerance, energy, self-esteem/guilt, functioning, and interest. (*Id.*). Dr. Belford indicated that Plaintiff had been doing great at a prior appointment but then she went off her medications and decompensated fairly quickly. (*Id.*). Plaintiff was anxious, easily overwhelmed, depressed, tearful, and struggling with concentration. (*Id.*). On exam, Plaintiff was fully oriented but exhibited: a restricted affect; a depressed, anxious, and irritable mood; and fair insight and judgment. (R. 761). Dr. Belford diagnosed major depressive disorder, recurrent, moderate, generalized anxiety disorder, and PTSD. She refilled Plaintiff's prescriptions (Trileptal,

9

Xanax, and Cymbalta), admonished her about the importance of medication compliance, and sent her for counseling. (R. 760-61). The following month, on November 15, 2013, Plaintiff told Dr. Belford that her mood was better. She was still having occasional panic attacks but they were occurring less frequently and were less intense than they used to be. (R. 757).

Plaintiff's first appointment with Dr. Belford following the May 31, 2014 alleged disability onset date was on July 1, 2014. At that time, Plaintiff was very happy and doing "great in terms of depression and anxiety." (R. 754). A few months later on September 19, 2014, Plaintiff's anxiety remained under control with no panic attacks or suicidal thoughts. (R. 751). During an October 1, 2014 mental status evaluation with consultative psychologist James B. Goebel, Ph.D., Plaintiff exhibited full affect, was very upbeat, smiled and laughed easily, and had a "wonderful attitude" and good eye contact. (R. 384). She was able to do calculations and serial sevens, correctly interpreted proverbs, and had good recall. (R. 384-85). Nevertheless, Dr. Goebel found her markedly limited in the ability to sustain concentration and persistence. (R. 385). A week later on October 8, 2014, Plaintiff attempted suicide by ingesting 2 handfuls of Xanax. (R. 399). She reported that her depressive thoughts were constant and severe and she was admitted to the hospital for major depression, recurrent, severe. (R. 399, 412). When Dr. Belford examined Plaintiff the next day she was irritable, labile, belligerent, anxious, and demanding, and denied that she had taken an overdose of Xanax. (R. 412). Plaintiff was still described as impulsive on October 10, with poor insight and judgment, an anxious mood, labile affect, and poor boundaries. (R. 422). By the time of her discharge on

10

October 14, 2014, Plaintiff was bright, cheerful, and cooperative with the staff, and less irritable with peers. (R. 412).

On October 20, 2014, Plaintiff returned to the hospital due to depression and anger. (R. 548). She exhibited poor insight and judgment and an agitated mood. She was mostly cooperative but also very tearful and argumentative at times. The attending physician diagnosed bipolar disorder, recurrent, and recommended Plaintiff attend a partial hospitalization program and then work with a therapist on discharge planning and follow-up care. (R. 549-50). Plaintiff was doing poorly again on January 30, 2015. She told Dr. Belford that she had anxiety "all of the time" and was using extra Xanax. (R. 748). The next month, on February 13, 2015, Plaintiff was once again noncompliant with her medications and having suicidal thoughts. Dr. Belford noted that Plaintiff frequently stops her medication because she feels she "is just not worth fighting for." (R. 744). Plaintiff was also resistant to going to counseling and reported being kicked out of her last program because they felt she was a "bully." (R. 744-45). Plaintiff complained of mood swings, was verbally lashing out at people, and was not showering or taking care of herself. (R. 745). Dr. Belford observed poor grooming; fair judgment and insight; a depressed, anxious, and irritable mood; and labile affect. (*Id.*). When Plaintiff returned to Dr. Belford on May 22, 2015, she was taking her medication and feeling more stable. (R. 810). Dr. Belford prescribed Trazodone to help with insomnia. (R. 811).

The record does not contain further mental health treatment records until April 7, 2016, at which time Plaintiff was once again admitted to the hospital after calling Dr. Belford's office and telling her nurse that she was feeling hopeless and worthless and thinking about suicide. (R. 849, 851). Upon admission, Plaintiff denied being suicidal

11

and became irritable and belligerent. (R. 851). Over the course of several days, Plaintiff became progressively calmer, less irritable, less anxious, less agitated, and more stable. She was discharged on April 11, 2016 with a diagnosis of bipolar disorder, instructions to continue seeing Dr. Belford, and a referral for individual therapy. (R. 849, 851-52).

Between May 4, 2016 and February 1, 2017, Plaintiff attended regular counseling sessions at Metropolitan Family Services to address her depression, anger, and frustration. (R. 858-83). She was doing well until January 25, 2017 when she started "blow[ing] up on everyone." (R. 859). At an appointment with Dr. Belford on February 10, 2017, Plaintiff was "very angry. She is literally quite enraged." (R. 940). Her medications included Xanax, Wellbutrin, Cymbalta, Trileptal, Neurontin, and Seroquel. (R. 941). On March 6, 2017, Plaintiff called Dr. Belford to say she was having thoughts of wanting to hurt someone again. (R. 933). Dr. Belford instructed her to increase her Neurontin and Seroquel to help with the anxiety and impulse control issues. (R. 934). The last available treatment note indicates that Plaintiff called Dr. Belford's office on March 13, 2017 to report that things had calmed down and she wanted to decrease her Seroquel, which makes her very tired in the daytime. (R. 937). Dr. Belford's colleague signed off on the dose reduction. (*Id.*).

The ALJ discussed this evidence in his decision but did not explain how it demonstrates that Dr. Belford's opinions were not entitled to much weight. It is true that Plaintiff was often oriented and not suicidal or homicidal, but she also had episodes of severe anxiety, depression, anger, mood swings, and irritability. In addition, she was hospitalized in October 2014 and April 2016 due to suicidal thoughts and actions. It is well-established that an ALJ "cannot simply cherry-pick facts that support a finding of non-

disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Here, the ALJ did not articulate why treatment notes documenting that Plaintiff was alert and non-suicidal undermine Dr. Belford's assessment that she nonetheless has significant functional limitations and often would be absent from, or ineffective at work due to severe depression, anxiety, belligerence, inability to concentrate, lack of impulse control and, at times, suicidal thoughts and attempts. *See, e.g., Punzio*, 630 F.3d at 710 ("[A] person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about her overall condition."); *Gerstner v. Berryhill*, 879 F.3d 257, 261-62 (7th Cir. 2018) (remand necessary where the ALJ fixated on select portions of the treatment notes).

The ALJ also took issue with Dr. Belford's assertion in her May 2016 opinion that Plaintiff had experienced 3 episodes of decompensation. According to the ALJ, the record contains no evidence of any episodes of decompensation at all. (R. 25). Plaintiff argues that this was error because the Seventh Circuit has recognized that "[a]n incident – such as hospitalization or placement in a halfway house – that signals the need for a more structured psychological support system would qualify as an episode of decompensation." *Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010). As noted, Plaintiff was hospitalized twice. The Commissioner does not address this argument or explain why it was proper for the ALJ to reject Dr. Belford's opinions on this basis.

Also problematic is the ALJ's observation that Dr. Belford's May 2016 opinion noted some inconsistency in Plaintiff's medication compliance. (R. 25, 845). It is not clear what significance the ALJ attached to this evidence but courts have cautioned that "mental illness in general and bipolar disorder in particular . . . may prevent the sufferer

13

from taking her prescribed medicines or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006). To the extent the ALJ may have rejected Dr. Belford's assessment of the severity of Plaintiff's symptoms because Plaintiff was noncompliant with treatment, this constitutes reversible error.

Another reason the ALJ gave for assigning little weight to Dr. Belford's opinions was that they are internally inconsistent. (R. 25). As the ALJ explained: "Dr. Belford claimed that the claimant has marked [limitations in] concentration, persistence, but the underlying factors in the same exhibit on page two indicates no marked limitations." (*Id.*). The ALJ did not identify which opinion he was referencing, and Plaintiff stresses that Dr. Belford's June 2015 opinion consistently found Plaintiff to have marked limitations in concentration, persistence, or pace and in several related categories, including: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; working within a schedule and maintaining regular attendance; and completing a normal workday/workweek without undue interruptions from psychologically based symptoms. (R. 816-17). In her May 2016 opinion, Dr. Belford reiterated that Plaintiff suffers from marked limitations in concentration, persistence, or pace, but in assessing the underlying categories, she found no more than moderate limitation of functioning. (R. 846-47). That said, the moderate limitations encompassed 13 of 17 areas, which Plaintiff maintains could translate into a marked overall rating in concentration. (Doc. 22, at 8). Absent further explanation from Dr. Belford, this Court has no way to evaluate Plaintiff's "translation" argument and cannot find reversible error on that basis. Regardless, given the other errors set forth above, the ALJ should take the opportunity on remand to clarify the nature of any inconsistencies in

Dr. Belford's opinions and explain why they support a wholesale rejection of her evaluations despite her lengthy treatment history with Plaintiff.[1]

Viewing the record as a whole, the ALJ did not provide a logical bridge between the evidence and her decision to reject Dr. Belford's opinions concerning the limiting effects of Plaintiff's bipolar disorder, anxiety disorder, and PTSD. The case must be remanded for further consideration of this issue.

### 2. Remaining Arguments

The Court does not find any specific error with respect to Plaintiff's remaining arguments but on remand the ALJ should reassess Plaintiff's limitations in concentration, persistence, or pace, and in the ability to get along with supervisors, and explain how any functional restrictions set forth in the mental RFC accommodate those deficiencies. The ALJ should also address Plaintiff's physical impairments and reevaluate her statements regarding the limiting effects of her symptoms.

### **CONCLUSION**

For the reasons stated above, Plaintiff's request to reverse or remand the ALJ's decision is granted, and the Commissioner's motion for summary judgment [30] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

---

[1] The ALJ also discounted Dr. Belford's opinions on the grounds that they were inconsistent with therapy notes from Metropolitan Family Services. (R. 25) (citing Exhibit 22F). The ALJ did not elaborate on this finding or cite to any specific notes within the exhibit as support. Since neither party discusses this aspect of the ALJ's decision, however, any arguments on this point have been waived. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013) (rejecting as waived arguments not raised in the district court).

Dated: January 27, 2021

ENTER:

*[signature: Sheila Finnegan]*

SHEILA FINNEGAN
United States Magistrate Judge

16